**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| Homer Dyer IV, as the representative of a class of similarly situated persons, and on behalf of the 1A Auto, Inc. Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>Richard Green, the Employee Benefits Administration Committee of the 1A Auto, Inc. Employee Stock Ownership Plan, Ventura Trust Company, and 1A Auto, Inc.,<br><br>Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.     Plaintiff Homer Dyer IV ("Plaintiff"), on behalf of the 1A Auto, Inc. Employee Stock Ownership Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act ("ERISA") against Defendants Richard Green, the Employee Benefits Administration Committee of the 1A Auto, Inc. Employee Stock Ownership Plan (the "Committee"), Ventura Trust Company ("Ventura"), and 1A Auto, Inc. (collectively, "Defendants"). Defendants caused the Plan to overpay for 1A Auto, Inc. stock and misused the Plan's income and other assets. Plaintiff seeks to recover the losses to the Plan, disgorgement of profits, and appropriate equitable and injunctive relief on behalf of Plan participants.

## JURISDICTION AND VENUE

2.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy

violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

3.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

4.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because (1) the case involves transactions between the Plan and 1A Auto, Inc., a company organized under the laws of Massachusetts; (2) 1A Auto, Inc.'s principal office is in Massachusetts, according to its most recent annual report filed with the Secretary of the Commonwealth; (3) Defendant Richard Green resides in Massachusetts; (4) all Committee members reside in Massachusetts; and (5) other important witnesses, including the bank that financed the transactions and all 1A Auto, Inc. board members, are located in Massachusetts.

## PARTIES

5.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The Plan was established by 1A Auto, Inc. in 2021 to provide retirement benefits to employees via minority ownership of the company. 1A Auto, Inc.'s stock is privately held and not publicly traded. The administrator of the Plan is 1A Auto, Inc. The Plan has more than 300 participants with account balances.

6.    Plaintiff Homer Dyer IV is an employee of 1A Auto, Inc. He has vested shares of 1A Auto, Inc. stock in his individual account in the Plan. His Plan account would have more shares of 1A Auto, Inc. stock in it, or more cash, if not for the unlawful transactions described herein.

7.     Defendant Richard Green is a founder, and the current President, of 1A Auto, Inc. At the time of the creation of the Plan and the relevant sales of company stock to the Plan, he was the sole director of 1A Auto, Inc. and a principal owner of 1A Auto, Inc.'s stock. He continues to control 1A Auto, Inc's board of directors and, on information and belief, to own a substantial portion of 1A Auto, Inc.'s stock. As the controlling stockholder and sole board member prior to the creation of the Plan, Green orchestrated the transactions between 1A Auto, Inc. and the Plan described herein, including hiring the Plan trustee and appointing Committee members. As a current board member, Green continues to exercise ultimate control over the administration and management of the Plan, including the appointment and removal of the Committee and trustee. Based on the above actions and authority with respect to the Plan, Green has at all times been a "fiduciary" of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii). He resides in Massachusetts.

8.     The Committee has been designated by 1A Auto, Inc. to administer the Plan. The Committee members are senior executives of 1A Auto, Inc., appointed to the Committee by 1A Auto, Inc.'s board of directors. The Committee instructs the Plan's trustee with respect to transactions involving Plan assets, including by providing instructions to the trustee concerning how to handle Plan dividends, contributions, and other transfers of assets to and from the Plan. Based on the above actions and authority with respect to the Plan, the Committee has at all times been a "fiduciary" of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii). On information and belief, all members of the Committee reside in Massachusetts.

9.     Ventura is the Plan's trustee. Ventura holds the shares of 1A Auto, Inc. stock owned by the Plan (and has authority to transfer those shares), receives all contributions and dividends paid to the Plan, pays loans and other obligations of the Plan, and allocates Plan assets

among the accounts of individual participants in the Plan. Based on the above actions and authority with respect to the Plan, the Ventura is a "fiduciary" of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i). Ventura is located in Minnesota.

10.     1A Auto, Inc. is a Massachusetts corporation. 1A Auto, Inc. is named as a Defendant solely as a necessary party to injunctive relief requests herein related to the rescission or reformation of any documents to which 1A Auto, Inc. is a party. No monetary relief is sought from 1A Auto, Inc.

## LEGAL AND FACTUAL BACKGROUND

### *ESOPs and Exempt Loans*

11.     The Plan acquired and holds shares of 1A Auto, Inc. stock subject to a loan from 1A Auto, Inc. This type of loan is referred to as an "exempt loan." 29 C.F.R. § 2550.403b–3(a)(3). Exempt loans are a common financing tool used by companies that sponsor employee stock ownership plans (ESOPs).

12.     The financing tool used by the Plan is referred to as an "exempt loan" because ERISA prohibits employers from making loans to their employee benefit plans. 29 U.S.C. § 1106(a)(1)(B). In order to promote employee ownership, Congress created an exemption for loans between employers and ESOPs sponsored for the benefit of their employees. *See* 29 U.S.C. § 1108(b)(3).

13.     In allowing the ESOP loan exemption, Congress understood that "the employer then will guarantee the debt obligation of the plan and will agree to make annual contributions to the plan sufficient to meet the plan's obligation of paying interest and principal on its debt." Senate Report 94–36, 59 (Mar. 17, 1975).

14.    The employer's obligation to make contributions to an ESOP to repay an exempt loan is fundamental to the legal status of the ESOP. *See* 26 U.S.C. § 401(a)(1); *see also Benefits Comm. of Saint-Gobain Corp. v. Key Tr. Co. of Ohio*, 313 F.3d 919, 925 (6th Cir. 2002) ("If a leveraged ESOP is created, the employer is obligated to make cash contributions to the ESOP[.]"). Contributions to repay the exempt loan must be "substantial and recurring." 29 C.F.R. § 2550.408b–3(h)(3); 26 C.F.R. § 54.4975-7(b)(8)(3).

15.    The employer's contributions to repay an exempt loan are vital because repayment of the exempt loan is how employees benefit from the ESOP. Shares of stock acquired using an exempt loan are not allocated to individual participant accounts until repayments on the exempt loan are made. 29 C.F.R. § 2550.408b–3(h)(1); *see also Benefits Comm. of Saint-Gobain Corp.*, 313 F.3d at 931.

16.    The number of shares allocated to participant accounts as a result of each payment on an exempt loan is based on the amount of such payment relative to all payments due on the exempt loan. Accordingly, arrangements that defer or reduce payments are disfavored and may fail to satisfy exemption requirements because the arrangement lacks a primary purpose to benefit employees. 29 C.F.R. § 2550.408b–3(h)(3); 26 C.F.R. § 54.4975-7(b)(8)(3).

17.    Exempt loans warrant "special scrutiny" and must be "truly arranged primarily in the interest of participants and their beneficiaries rather than, for example, in the interest of certain selling shareholders." 29 C.F.R. § 2550.408b-3(b)(2).

18.    Once shares of stock acquired with an exempt loan are allocated to individual participant accounts, the shares are no longer collateral for the exempt loan, and the company has no recourse against those shares.[1] *See* 29 C.F.R. § 2550.408b–3(e); *see also* 26 U.S.C. § 409(c).

---

[1] Shares that have not yet been allocated to participant accounts are called "unallocated" shares.

19.     Assets owned by an ESOP prior to the making of an exempt loan may not be used to repay the exempt loan. *See id.*; Internal Revenue Service*,* "Examining Employee Stock Ownership Plans (ESOPs)," p. 13 (2003), *available at* www.irs.gov/pub/irs-tege/epche803.pdf ("The purpose of [29 C.F.R. § 2550.408b–3(e)] is that pre-existing plan assets prior to the exempt loan should not be used to service the debt."); *see also Benefits Comm. of Saint-Gobain Corp.*, 313 F.3d at 928–32; IRS Priv. Ltr. Rul. 8044074, 1980 WL 135505 (Aug. 11, 1980).

20.     Shares of stock acquired using an exempt loan are protected from any "put, call, or other option, or buy-sell or similar arrangement" that would force an ESOP to deal at a specific price or terms in the future. 29 C.F.R. § 2550.408b–3(d).

### *Exempt Loans and Preferred Stock*

21.     Corporations may issue multiple classes of stock with distinct rights and obligations.

22.     "Preferred stock" is a class of stock that typically bestows upon the holder the right to receive specified dividend income from the company that issued the stock. The guaranteed dividends to preferred stock holders have priority over the claims of other stockholders, *i.e.*, "common" stockholders.

23.     "Convertible preferred stock" is preferred stock that may be converted to common stock pursuant to terms defined between the company and the buyer of the convertible preferred stock.

24.     The fixed income provided by preferred stock dividends, combined with the flexibility to convert it to common stock if common shares would produce meaningful gains, generally allows private companies to price convertible preferred stock at a premium relative to common stock.

25.    Issuing and managing convertible preferred stock in the context of a leveraged ESOP funded by an exempt loan creates risk of unfair treatment of ESOP participants, if the ESOP paid a premium price for the convertible preferred stock.

26.    While dividends earned on company stock acquired by an ESOP with the proceeds of an exempt loan generally may be used to repay the corresponding exempt loan, using convertible preferred stock dividends for which the ESOP paid a premium price to reduce the employer contributions that the ESOP would be entitled to regardless of whether the shares were convertible preferred shares or common shares negates the extra value associated with preferred stock for which the ESOP paid the premium price. In order for the ESOP and its participants to receive the economic benefit of the premium price paid for convertible preferred stock, the ESOP must receive *both* the employer contributions necessary to repay the exempt loan *and* the preferred dividends. Otherwise, the ESOP overpaid for the stock by paying a higher price for income to which it was already entitled, and the stock acquisition transaction was therefore prohibited. *See* 29 U.S.C. § 1106(a)(1)(A); 29 U.S.C. § 1108(e)(1); *see also Randall on behalf of Wells Fargo & Co. 401(k) Plan v. GreatBanc Tr. Co.*, 2024 WL 713997, at *6 (D. Minn. Feb. 21, 2024).

27.    Additionally, if the preferred dividends that generated the premium price for convertible preferred shares are intended to be used to offset the employer contributions to which the ESOP is otherwise entitled, an exempt loan made in the amount of the premium price is not made primarily for the benefit of employees. In such a case, the premium amount of the exempt loan is made to benefit of the seller by awarding a premium price without a corresponding economic benefit to employees, and the loan is prohibited. *See* 29 C.F.R. § 2550.408b-3(b)(2). The making of the loan is also disloyal and imprudent, and such offsetting of employer contributions, if carried out, constitutes the misuse of Plan assets for the benefit of the company and seller. *See*

29 U.S.C. § 1104(a)(1); *Randall on behalf of Wells Fargo & Co. 401(k) Plan*, 2024 WL 713997, at *7.

### Exempt Loan and Company Stock Transactions Between the Plan and 1A Auto, Inc.

28.    1A Auto, Inc. established the Plan effective January 1, 2021.

29.    On April 25, 2022, Green amended the Articles of Organization of 1A Auto, Inc. Prior to the amendment, the company was only authorized to issue common shares, of which there were 100,000 shares outstanding. Green's amendment created a new class of 1A Auto, Inc. stock for the first time: convertible preferred stock. The amendment provided that the 100,000 common shares held by the company's current owners—principally if not solely Green or members of his family—were exchanged for (i) 235,454 shares of convertible preferred stock and (ii) 700,000 shares of common stock.

30.    Accordingly, after the amendment, approximately 25% of the 1A Auto, Inc.'s outstanding stock was nominated convertible preferred stock, and the remaining 75% of 1A Auto, Inc.'s stock was nominated common stock.

31.    On April 29, 2022, Green, the company, and the Plan entered into a series of concurrent and contingent transactions and arrangements that had the purpose and effect of selling all 235,454 shares of 1A Auto, Inc.'s convertible preferred shares (approximately 25% off all of the company's issued stock) to the Plan for $31,947,799 ($135.96 per share). There were several parts to this transaction.

32.    First, Green and his advisors assigned a value to the newly issued convertible preferred shares and appointed representatives of the Plan to accept that valuation. The valuation became the price of the convertible preferred shares in the transaction. The price determined for the convertible preferred stock by Green and his appointed representatives of the Plan represented

a premium relative to the fair market value of an equivalent percentage of the company's common equity immediately prior to the creation of the convertible preferred stock on April 25, 2022.

33.    The price premium charged for 1A Auto, Inc.'s convertible preferred stock was calculated in whole or substantial part based on the value of the preferred dividends owed by 1A Auto, Inc. to the holder of the convertible preferred stock. In all other respects, the convertible preferred stock was the same as common stock.

34.    The preferred dividends due on the convertible preferred shares are $8.56 per share, or $2,015,486.25 on all convertible preferred shares, payable on December 28 of each year (approximately 6.3% of the purchase price). However, the convertible preferred shares are subject to a redemption right that allows 1A Auto, Inc. to force the holder to convert to common shares at a conversion ratio of 1:1 after the December 28, 2025 dividend. If the holder does not convert, the company can redeem the convertible preferred shares at its sole option at a pre-set price that is less than what the Plan paid.

35.    Given the company's redemption right, the promise of $8,061,945 of dividend income over the next 4 years[2] constituted substantially all of the value for which the Plan paid a premium price for convertible preferred stock.

36.    The transaction proceeded in steps. First, Green and any other holders of the newly issued convertible preferred shares sold those shares back to 1A Auto, Inc. at the $31,947,799

---

[2] $8,061,945 = $2,015,486.25 paid on December 28, 2022, December 28, 2023, December 28, 2024, and December 28, 2025.

price determined by Green and his appointed representatives of the Plan. The company borrowed

cash from a bank in order to pay Green and any other sellers for their convertible preferred shares.[3]

37.     Then, the company made an exempt loan to Plan in the face amount of the price of

the convertible preferred shares, $31,497,779, and transferred all 235,454 convertible preferred

shares to the Plan. The exempt loan is payable over 10 years at 2.25% annual interest. Immediately

following the transaction, the Plan held all 235,454 shares in an unallocated suspense account as

collateral for the exempt loan.

38.     The April 29, 2022 exempt loan arrangement allows 1A Auto, Inc. to reduce the

employer contributions necessary to pay the loan by the amount of the convertible preferred

dividends received by the Plan:

> *Contributions*
> The Company is obligated to make contributions in cash to the Plan which, when
> aggregated with the Plan's dividends and interest earnings, equal the amount necessary to
> enable the Plan to make its regularly scheduled payments of principal and interest due on
> its term loan. Employee contributions are not permitted.

39.     Defendants have published inconsistent information, and withheld from public

reporting other information, necessary for Plaintiff to make detailed allegations regarding

Defendants' management of the exempt loan. *See infra* ¶¶ 47–56.

40.     Notwithstanding the above, it is plain that the Plan has not received the benefit of

the premium price that it paid for the convertible shares because Defendants have allowed the

---

[3] The complete financing terms are not available to Plaintiff at this stage. The cash consideration
provided by the bank loan may have been supplemented by other financing or consideration to
equal the total price of $31,947,779.

company to use the Plan's preferred dividends to offset the contributions that would otherwise be necessary to regularly service the exempt loan.

41.     Defendants accomplished this offsetting either by failing to obtain the employer contributions required by the written terms of the exempt loan, or by manipulating the terms of the exempt loan such that the exempt loan called for reduced employer contributions during the four years in which the Plan expected to receive preferred dividends to augment those contributions to the level necessary to regularly service the exempt loan. While documents necessary to understand how Defendants structured and executed the offsets are not available to Plaintiff at this stage, in either case, Defendants' conduct was unlawful and had the purpose and effect of using the exempt loan and preferred dividends to generate a premium price for Green and the company without providing a corresponding benefit to Plan participants.

42.     For example, the Plan received the $2,015,486.25 annual dividend due on convertible shares in both 2022 and 2023 and then paid the dividend back to 1A Auto, Inc. each year as debt service on the exempt loan. In each year, the contributions made by 1A Auto, Inc. were less than the amount needed to make regular debt service payments on the exempt loan.

43.     On information and belief, the same offset and resulting contribution deficiency occurred in 2024, and Defendants intend to repeat the same in 2025.

44.     The effect of contribution-offsetting is two-fold. First, participants are deprived of immediate allocations to their accounts. At year-end 2023, participants were allocated 56,946 shares. However, had the Plan received contributions from 1A Auto, Inc. necessary to regularly service the exempt loan *and* the preferred dividends for which it paid a premium price, participants would have been allocated approximately 30,000 additional shares by that date. The missing shares

would have been worth approximately $3.4 million to participants based on the most recently published appraisal.[4]

45.    On information and belief, a further allocation deficiency occurred, or will occur, with respect to the 2024 and 2025 plan years as a result of Defendants allowing 1A Auto, Inc. to use the Plan's preferred dividends to reduce its contributions.[5]

46.    Second, because the Plan did not receive the benefit of the premium price that it paid for 1A Auto, Inc.'s convertible preferred shares—and was not expected to receive that benefit at the time of the transaction given the offsets that Defendants intended to apply to 1A Auto, Inc.'s contributions—the Plan overpaid for the convertible preferred shares. The Plan will therefore require more income over the life of the exempt loan to pay off the excessive price and allocate all of the Plan's stock to participants. This hurts participants because more Plan income will be used to allocate shares, whereas if participants received the same shares using less income, the difference would accrue to participants' benefit as income or gains *on top* of their shares.

### Missing Audit and Issues for Accounting

47.    A complete record of Defendants' management of the exempt loan and share allocations since the loan was made on April 29, 2022 cannot be reconciled from the information presently available to Plaintiff. There are conflicts in the information available regarding when the

---

[4] There was approximately $475,000 in cash allocated to participants as of year-end 2023, but that amount does not come close to making up the share value deficit.

[5] The participant account allocation deficiency could also manifest in the form of cash. If Defendants compelled 1A Auto, Inc. to make regular employer contributions in the full amount necessary to regularly service the exempt loan, the preferred dividends could be allocated to participants in only two ways, either (i) cash or (ii) as additional payments on the exempt loan, which would allocate additional shares to participants. In either case, Plan participants would have higher account balances today if Defendants had not allowed 1A Auto, Inc. to reduce its contributions below the level necessary to regularly service the exempt loan.

loan should be deemed to be effective, what payments were due, what payments were made, and what payments were considered for purposes of participant share allocations.

48.    For example, in preparing the Plan's annual reports,[6] the Plan's auditor reported that the Plan received a 2021 contribution in the amount of $3,432,602. The Plan's reports treat that 2021 contribution as a payment toward the April 29, 2022 exempt loan, generating part of the share release to participants for the 2022 plan year. In contrast, Plaintiff's account statements reflect that the exempt loan payment and share allocation associated with the 2021 contribution were backdated to 2021, resulting in separate loan payments and share allocations for 2021 and 2022.

49.    Defendants' treatment of the effective date and the timing of payments on the April 29, 2022 exempt loan is not clarified by the supplementary financial information that typically accompanies an ESOP's annual reports. This is because Defendants failed to provide financial statements for 2021 to the Plan's auditor. The Plan's auditor provided the following statement, noting that it "did not audit or review" the Plan's financial statements for 2021:

> **Other Matter- Report on the 2021 Financial Statements**
>
> We performed a compilation engagement with respect to the 2021 financial statements and our report thereon, dated October 11, 2023 stated we did not audit or review those financial statements and, accordingly, express no opinion or other form of assurance on them.

50.    Accordingly, there are no supplementary financial statements or notes to financial statements available to Plaintiff regarding the apparent backdating of the exempt loan transaction and the first contribution, payment, and share allocation to 2021.

---

[6] Employee stock ownership plans, like other employer-sponsored benefit plans, file annual reports with the Department of Labor, which the Department of Labor makes public. Plans with more than 100 participants are generally required to file supplementary financial statements with their report, in addition to the standardized report forms.

51.     There are further inconsistences, or errors, in the Plan's reporting with respect to the effective date of the exempt loan and the timing and amounts of payments. For example, the Plan's 2022 annual report describes the future payments due on the exempt loan and implies that the last payment will be made in 2031—a 10-year loan term starting in 2022. However, the same description in the Plan's 2023 annual report implies that the last payment will be made in 2030— a 10-year term for a loan effective in 2021.

52.     Additionally, the reported interest expenses of the Plan with respect to the exempt loan are not accurate. The 2022 reported interest expense of $930,409 far exceeds the amount of interest that could have possibly accrued on the exempt loan during the calendar year, even if it was deemed to be effective on or before the first day of the year. In 2023, the reported interest expense of $433,493 is much less than would have accrued, given the minimum exempt loan balance maintained throughout the year.

53.     Further, it does not appear from the Plan's reports that the Plan is making interest payments at all. The interest expenses appear to be included in "operating payables" still owed by the Plan at the end of each year. The number of shares allocated to participants is consistent with interest payments not being made. If the interest was being paid each year, the number of shares allocated to participants should be higher.[7]

54.     The reported amounts of principal payments on the exempt loan also cannot be reconciled from the information available. For example, the 2023 share allocation to participants is consistent with an aggregate principal payment (funded primarily by the preferred dividend) of

---

[7] The Note in the Plan's annual reports regarding the exempt loan states that interest payments, if made, should be considered for purposes of the share release. This is the general rule, and based on the Note, it does not appear that the Plan has made the special election required to consider only principal payments when allocating shares. *See* 29 C.F.R. § 2550.408b–3(h)(1)-(2).

around $2.8 million. The principal balance reduction for 2023 was reported to be $3.3 million, but it appears that either this reduction was overstated, the full amount was not considered for purposes of the share allocation, or the remaining payment schedule was misapplied for purposes of the share allocation. If the Plan had been credited with a $3.3 million payment in 2023, the share release to participants for 2023 should have been higher.

55.     The foregoing loan payment and share allocation inconsistencies or errors require a complete accounting of the April 29, 2022 exempt loan, including all loan documents and amendments thereto; all loan payments recorded, the effective date recognized for such payments, the source of funds for such payments, and the allocation of such payments between principal and interest; all interest accruals recognized by the Plan and all worksheets for calculating the same; all contributions and preferred dividends received by the Plan, including the date that the Plan received the funds and how the funds were applied; any other adjustments to the loan balance recorded at any time; and all worksheets governing participant share allocations, including all information necessary to determine the number of shares allocated to each participant in each share allocation, the effective date of each share allocation, all loan payments considered for purposes of each share allocation, and the remaining loan schedule of principal and interest payments considered for purposes of each share allocation.

56.     The foregoing inconsistencies do not affect the conclusion that Defendants engaged in unlawful offsetting of contributions. It is plain, under any scenario, that Defendants engaged in unlawful offsetting. Whether the April 29, 2022 exempt loan was deemed to be effective in 2021 or 2022, the 2021 contribution does not count as an employer contribution necessary to service the loan in 2022 and thereafter. The 2021 contribution either satisfied the payment due in 2021, pursuant to the apparent backdating of the exempt loan's effective date, or it was a pre-existing

Plan asset that should not have been used to pay the exempt loan made effective in 2022. In either case, the Plan required new contributions of approximately $3.5 million in 2022 and each year thereafter to provide regular debt service on the exempt loan, which the Plan did not receive (instead, the required amount was met through preferred dividends).[8] An accounting of Plan income and the exempt loan is necessary to determine the precise allocation deficits caused by Defendants' offsetting of contributions, and to account for any other allocation deficits caused by errors or other failures by Defendants to service the exempt loan.

### PLAN-WIDE RELIEF

57.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

58.     Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary violations of ERISA and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

59.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interests are aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

---

[8] Even if the 2021 contribution counted toward the required debt service contributions for 2022 and subsequent years, Defendants still shorted the Plan on contributions, resulting in a deficit of approximately 15,000 shares worth $1.7 million as of year-end 2023.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

61.     Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All Plan participants since the inception of the Plan, excluding employees who left the company before vesting in any part, and excluding Defendants, any Committee member, and any other persons with fiduciary responsibilities related to transactions between the Plan and the company.

62.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has more than 300 participants with account balances.

63.     Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a 1A Auto, Inc. employee with an account in the Plan, and all Plan participants suffered injuries, as Plaintiff did, resulting from the unlawful use of Plan assets to offset employer contributions owed to the Plan, and from other lawful dispositions of Plan assets. All Plan participants have an interest in a complete accounting of the Plan since its inception to ensure that participants' accounts are credited properly, given the premium price the Plan paid for 1A Auto, Inc.'s convertible preferred stock.

64.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

65.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.   Whether each Defendant was a fiduciary of the Plan, and the scope of their duties;

      b.   Whether Defendants failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

      c.   Whether the exempt loan and use of preferred dividends to pay employer contributions violated 29 U.S.C. § 1106;

      d.   Whether the redemption clause violates ERISA;

      e.   The proper form of equitable and injunctive relief; and

      f.   The proper measure of monetary relief.

66.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

67.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of the interests of all participants.

68.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only

individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

69.    Plaintiff and his undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## CAUSES OF ACTION

### COUNT I

**Breach of Fiduciary Duty, 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1105(a)**
**Against All Defendants**

70.    Plaintiff incorporates the foregoing allegations by reference.

71.    The Committee authorized the terms of the Plan's convertible preferred stock acquisition and corresponding exempt loan that allow the offsetting of employer contributions with preferred dividends, notwithstanding the premium price that the Plan paid for convertible preferred stock relative to common stock. Additionally, the Committee instructed the Plan trustee to use convertible preferred stock dividends to repay the Plan's exempt loan, notwithstanding the premium price that the Plan paid for preferred dividends, and failed to instruct the Plan trustee to enforce the Plan's right to receive the full amount of employer contributions necessary to satisfy

19

the company's obligation to make regular contributions to service the exempt loan.

72.     Green authorized the terms of the Plan's convertible preferred stock acquisition and corresponding exempt loan that allow the offsetting of employer contributions with preferred dividends, notwithstanding the premium price that the Plan paid for convertible preferred stock relative to common stock. He also allowed the Committee to commit the actions and omissions described in the above paragraph and the subsequent paragraph, which he had a duty to monitor and prevent given their unlawful nature.

73.     Ventura complied with the Committee's instructions described in the above paragraph despite having a legal duty not to follow instructions that were contrary to ERISA. The illegal actions permitted by Ventura include, among other things, allowing Defendants and the company to usurp Plan assets and use them for self-interested purposes. Ventura also failed to ensure a proper accounting of the April 2022 preferred stock transaction took place, including a public audit and an accurate description in the Plan's annual reports of the terms of the transaction. Finally, Ventura failed to enforce the Plan's right to receive the full amount of employer contributions to which it was entitled.

74.     The foregoing actions and omissions by Defendants were imprudent and disloyal and favored the interests of the company and Green over the interest of Plan participants, in violation of 29 U.S.C. § 1104(a)(1).

75.     Each Defendant participated knowingly in and enabled the breaches of fiduciary duty committed by their co-Defendants, and failed to remedy such breaches. Additionally, Green and the Committee attempted to conceal their respective breaches by instructing the Plan's auditor to not review or opine on the Plan's financial statements for 2021 and to assume facts for public reporting that obscure Defendants' treatment of the exempt loan.

76.    The foregoing actions and omissions of Defendants caused losses to the Plan and its participants in the form of paying too much for the convertible preferred stock and the loss of dividend income and contributions, and the corresponding allocations of shares or cash, that would have occurred. Pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), the Plan is entitled to recover from Defendants all losses to the Plan including lost dividend and contribution income, the excess amounts paid for the convertible preferred stock, and the value of improperly diverted assets of the Plan. The Plan is also entitled to disgorgement of profits that Green has realized from these violations of ERISA.

77.    Plan participants are entitled to an order pursuant to the above provisions or 29 U.S.C. § 1132(a)(3) requiring such allocations or adjustments to their accounts as necessary to put them in the position that they would be in had the Plan received all employer contributions that should have been made to service the exempt loan without regard to any reduction for payments on the exempt loan that were funded by convertible preferred stock dividends for which the Plan paid a premium or by pre-existing assets of the Plan. Plan participants are further entitled to rescission and reformation of any governing documents of the Plan or contracts involving the Plan that purport to authorize the unlawful contribution offsetting-conduct described herein.

## COUNT II

### Prohibited Transactions in Violation of 29 U.S.C. § 1106(a) and 29 U.S.C. § 1105(a) Against All Defendants

78.    Plaintiff incorporates the foregoing allegations by reference.

79.    1A Auto, Inc. has at all times been a party in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(C).

80.    Green has at all times been a party in the interest to the Plan pursuant to 29 U.S.C. § 1002(14)(E),(H) & (I).

81.    Given the premium price that the Plan paid for 1A Auto, Inc.'s convertible preferred stock—notwithstanding the allowance of offsets against employer contributions for preferred dividends—and the intention and effect of thereby creating an additional benefit for 1A Auto, Inc. and Green, (i) the sale of convertible preferred stock by the 1A Auto, Inc. to the Plan, (ii) the corresponding exempt loan between 1A Auto, Inc. and the Plan, and (iii) all transfers of preferred dividends by the Plan back to 1A Auto, Inc. that had the effect of offsetting employer contributions were prohibited transactions in violation of 29 U.S.C. § 1106(a)(1).

82.    The Committee approved or directed transactions described in the above paragraph on behalf of the Plan.

83.    Ventura executed transactions described in the above paragraph on behalf of Plan.

84.    Green approved and failed to prevent, despite having a duty to monitor the Committee and Ventura, transactions described in the above paragraph.

85.    Each Defendant participated knowingly and enabled the prohibited transactions committed by their co-Defendants, and failed to remedy such violations. Additionally, Green and the Committee attempted to conceal their respective breaches by instructing the Plan's auditor to not review or opine on the Plan's financial statements for 2021 and to assume facts for public reporting that obscure Defendants' treatment of the exempt loan.

86.    As a result of the prohibited transactions described in this section, the Plan and its participants suffered the same losses and are entitled to the relief as described in paragraphs 76 and 77, above.

## COUNT III

### Prohibited Transactions in Violation of 29 U.S.C. § 1106(b)
### Against Richard Green

87.    Plaintiff incorporates the foregoing allegations by reference.

88.     Green orchestrated, directed, and approved the April 29, 2022 convertible preferred share transaction between 1A Auto, Inc. and the Plan and the corresponding exempt loan in order to provide himself the improper benefit of the premium price assigned to 1A Auto, Inc.'s convertible preferred shares, notwithstanding the allowance of offsets against employer contributions for preferred dividends. He received that benefit in the form of the premium price paid for shares sold to 1A Auto, Inc. concurrently with the Plan's acquisition of the convertible preferred shares from the 1A Auto, Inc. at the same price, and the making of the corresponding exempt loan. The foregoing actions violated 29 U.S.C. § 1106(b)(1)–(3).

89.     As a result of the prohibited transactions described in this section, the Plan and its participants suffered the same losses and are entitled to the relief as described in paragraphs 76 and 77, above.

### COUNT IV

**Accounting of the Plan Pursuant to 29 U.S.C. § 1132(a)(3)**
**Against All Defendants**

90.     Plaintiff incorporates the foregoing allegations by reference.

91.     The Plan's missing 2021 audit and the conflicting information provided in the Plan's annual reports and participant account statements creates multiple issues with respect to the proper accounting of the exempt loan and related transactions between the company and the Plan.

92.      The complete and accurate record of all transactions between the Plan and 1A Auto, Inc. since the inception of the Plan may be different than the record suggested by the information presently available. An accounting is necessary to determine the precise adjustments that must be made to participants' accounts to remedy the unlawful offsetting conduct described herein. Additionally, a complete accounting is likely to identify additional participant allocation

shortfalls due to errors or non-payment of the exempt loan.

93.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff, on behalf of the Plan, is entitled to an accounting of the Plan from the date of its inception through the present. Such accounting must identify all transactions between the Plan and 1A Auto, Inc., including the information identified in paragraph 55, above.

94.     After the above-described accounting, Plaintiff and the Plan are entitled to demand and receive appropriate additional relief based on facts discovered through such accounting, and to an order tolling any statute of limitations that may otherwise be applicable to such claims due to Defendants' act of concealment in connection with the missing 2021 audit and other annual reporting inconsistencies and errors.

## COUNT V

### Injunctive Relief Limiting Enforcement of Company's Redemption Right Pursuant to 29 U.S.C. § 1132(a)(3)
### Against All Defendants

95.     Plaintiff incorporates the foregoing allegations by reference.

96.     The redemption right granted to 1A Auto, Inc. in its Articles of Organization, as amended effective April 25, 2022, Paragraph 4.04(d), with respect to the convertible preferred shares held by the Plan, if enforced, would have the effect of depriving the Plan of the option to continue to hold the convertible preferred stock that it acquired with the exempt loan after 2025. The redemption right functions alongside the conversion provision, Paragraph 4.04(c), to force the Plan to convert its convertible preferred shares to common shares and no longer receive preferred dividends, or risk redemption of its convertible preferred shares at a pre-arranged price that is less than what the Plan paid for those shares.

97.     The redemption and conversion provision is a "put, call, or other option, or buy-sell or similar arrangement" as contemplated by 29 C.F.R. § 2550.408b–3(d), and because the convertible preferred shares were acquired using the proceeds of an exempt loan, the redemption and conversion clause is unlawful pursuant to the same regulation, if enforced against the Plan.[9]

98.     Additionally, the pre-set redemption price could be enforced to unlawfully cause the Plan to transfer the convertible preferred shares to the company at a price that is less than the fair market value of the shares at the time of the transaction, in violation of 29 U.S.C. § 1106.

99.     Plaintiff, on behalf of the Plan, is entitled to an order enjoining Defendants from transferring or directing the Plan to transfer the Plan's convertible preferred shares to the company pursuant to the above-described redemption provision if, at the time that the company seeks enforcement of the same, (i) the interest of Plan participants requires the Plan to continue to hold the convertible preferred shares and received the preferred dividends or (ii) the effect of the enforcement of the pre-set redemption price would be that the company redeems the Plan's convertible preferred shares for less than their fair market value.

## PRAYER FOR RELIEF

100.    Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

      A.     Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

      B.     Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P.

---

[9] 26 U.S.C. § 409(l)(3) allows convertible preferred shares with a common share conversion feature to be treated as qualified ESOP assets in general but does not specifically authorize the use of such securities in connection with an exempt loan over the limitation stated in 29 C.F.R. § 2550.408b–3(d), nor does it render any transaction as not prohibited under 29 U.S.C. § 1106.

23, certify Plaintiff as class representative, and certify his counsel as class counsel;

C.   Order Defendants to make good to the Plan all losses resulting from their violations of ERISA, and to disgorge their profits;

D.   Impose equitable and injunctive relief sufficient to protect Plan participants in the future and ensure proper allocation of cash proceeds and other relief obtained in this action to Plan participants;

E.   Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

F.   Award prejudgment and post-judgment interest; and

G.   Award such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Date: April 28, 2025

**BLOCK & LEVITON, LLP**

/s/ Jason M. Leviton
Jason M. Leviton (BBO #678331)
Brendan Jarboe (BBO#691414)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: 617-398-5600
jason@blockleviton.com

**ENGSTROM LEE LLC**
Mark E. Thomson, MN Bar No. 0398260*
Carl F. Engstrom, MN Bar No. 0396298*
323 N Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
mthomson@engstromlee.com
cengstrom@engstromlee.com
*pro hac vice* application forthcoming

**ATTORNEYS FOR PLAINTIFF**