**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| Homer Dyer IV, as the representative of a class of similarly situated persons, and on behalf of the 1A Auto, Inc. Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>Richard Green, Michael Green, Jennifer Gavrichev, the Employee Benefits Administration Committee of the 1A Auto, Inc. Employee Stock Ownership Plan, Neil Brozen, Ventura Trust Company, and 1A Auto, Inc.,<br><br>Defendants. | Case No.: 1:25-cv-11152-RGS<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiff Homer Dyer IV ("Plaintiff"), on behalf of the 1A Auto, Inc. Employee Stock Ownership Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act ("ERISA") against Defendants Richard Green, Michael Green, Jennifer Gavrichev, the Employee Benefits Administration Committee of the 1A Auto, Inc. Employee Stock Ownership Plan (the "Committee"), Neil Brozen, and Ventura Trust Company ("Ventura"), and 1A Auto, Inc. (collectively, "Defendants"). Defendants caused the Plan to overpay for 1A Auto, Inc. stock and misused the Plan's assets. Plaintiff seeks to recover the losses to the Plan, disgorgement of Defendants' profits, and appropriate equitable and injunctive relief on behalf of Plan participants.

1

## JURISDICTION AND VENUE

2.    Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

3.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

4.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because (1) the case involves transactions between the Plan and 1A Auto, Inc., a company organized under the laws of Massachusetts; (2) 1A Auto, Inc.'s principal office is in Massachusetts, according to its most recent annual report filed with the Secretary of the Commonwealth; (3) Defendants Richard Green, Michael Green, and Jennifer Gavrichev reside in Massachusetts; (4) all Committee members reside in Massachusetts; and (5) other important witnesses, including the bank that financed the transactions and all 1A Auto, Inc. board members, are located in Massachusetts.

## PARTIES

5.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The Plan was established by 1A Auto, Inc. in 2021 to provide retirement benefits to employees via minority ownership of the company's stock. 1A Auto, Inc.'s stock is privately held and not publicly traded. The Plan is permitted to hold other assets for the benefit of participants. The Plan has more than 300 participants with individual account balances. The benefit a Plan participant receives is the value of their individual account at the time that it is

distributed from the Plan. Distributions are not available until after a participant leaves the company. The administrator of the Plan is 1A Auto, Inc.

6. Plaintiff Homer Dyer IV is an employee of 1A Auto, Inc. He has vested shares of 1A Auto, Inc. stock in his individual account in the Plan. His Plan account would have more shares of 1A Auto, Inc. stock in it, or more cash, if not for the unlawful transactions described herein.

7. Defendant Richard Green is a founder, and the current President, of 1A Auto, Inc. At all relevant times, he was a board member and part owner of 1A Auto, Inc. On information and belief, he is also a Committee member. He resides in Massachusetts.

8. Defendant Michael Green is a founder of 1A Auto, Inc. At all relevant times, he was a board member and part owner of 1A Auto, Inc. On information and belief, he is also a Committee member. He resides in Massachusetts.

9. Defendant Jennifer Gavrichev is a member of the founding family of 1A Auto, Inc. At all relevant times, she was a board member and part owner of 1A Auto, Inc. On information and belief, she is also a Committee member. She resides in Massachusetts.

10. Richard Green, Michael Green, and Jennifer Gavrichev are siblings. Any reference to "the Family Defendants" herein means all three.

11. According to reports filed by 1A Auto, Inc. with the U.S. Department of Labor, 1A Auto, Inc. has designated the Committee to administer the Plan. The Committee members are four senior executives of 1A Auto, Inc., appointed to the Committee by 1A Auto, Inc.'s board of directors. On information and belief, all members of the Committee reside in Massachusetts.

12. Neil Brozen was the Plan's trustee in April 2022. Brozen had discretion to approve, and did approve, the Plan formation transaction on behalf of the Plan. Until Brozen substituted Ventura as Plan trustee (*see infra*), Brozen held the shares of 1A Auto, Inc. stock owned

by the Plan, received all contributions and dividends paid to the Plan, paid loans and other obligations of the Plan, and allocated Plan assets among the accounts of individual participants in the Plan. Brozen resides in Minnesota.

13.    Ventura is the Plan's current trustee. Ventura is a Minnesota chartered trust company incorporated by Brozen in December 2022 and controlled by Brozen. In around March 2023, 1A Auto, Inc. agreed to replace Brozen with Ventura as the Plan's trustee. As trustee, Ventura holds the shares of 1A Auto, Inc. stock owned by the Plan, receives all contributions and dividends paid to the Plan, pays loans and other obligations of the Plan, and allocates Plan assets among the accounts of individual participants in the Plan.

14.    1A Auto, Inc. is a Massachusetts corporation. 1A Auto, Inc. is named as a Defendant solely as a necessary party to injunctive relief requests herein related to the rescission or reformation of any documents to which 1A Auto, Inc. is a party.

## LEGAL AND FACTUAL BACKGROUND

### *ESOPs and Exempt Loans*

15.    The Plan acquired and holds shares of 1A Auto, Inc. stock subject to a loan from 1A Auto, Inc. This type of loan is referred to as an "exempt loan." 29 C.F.R. § 2550.403b–3(a)(3). Exempt loans are a common financing tool used by companies that sponsor employee stock ownership plans (ESOPs).

16.    The financing tool used by the Plan is referred to as an "exempt loan" because ERISA prohibits employers from making loans to their employee benefit plans. 29 U.S.C. § 1106(a)(1)(B). In order to promote employee ownership, Congress created an exemption for loans between employers and ESOPs sponsored for the benefit of their employees. *See* 29 U.S.C. § 1108(b)(3).

17.     In allowing the ESOP loan exemption, Congress understood that "the employer then will guarantee the debt obligation of the plan and will agree to make annual contributions to the plan sufficient to meet the plan's obligation of paying interest and principal on its debt." Senate Report 94–36, 59 (Mar. 17, 1975).

18.     The employer's obligation to make contributions to an ESOP to repay an exempt loan is fundamental to the legal status of the ESOP. *See* 26 U.S.C. § 401(a)(1); *see also Benefits Comm. of Saint-Gobain Corp. v. Key Tr. Co. of Ohio*, 313 F.3d 919, 925 (6th Cir. 2002) ("If a leveraged ESOP is created, the employer is obligated to make cash contributions to the ESOP[.]"). Contributions to repay the exempt loan must be "substantial and recurring." 29 C.F.R. § 2550.408b–3(h)(3); 26 C.F.R. § 54.4975-7(b)(8)(3).

19.     The employer's contributions to repay an exempt loan are vital because repayment of the exempt loan is how employees benefit from the ESOP. Shares of stock acquired using an exempt loan are not allocated to individual participant accounts until repayments on the exempt loan are made. 29 C.F.R. § 2550.408b–3(h)(1); *see also Benefits Comm. of Saint-Gobain Corp.*, 313 F.3d at 931.

20.     The number of shares allocated to participant accounts as a result of each payment on an exempt loan is based on the amount of the payment relative to all payments due on the exempt loan. Accordingly, arrangements that defer or reduce payments are disfavored and may fail to satisfy exemption requirements because the arrangement lacks a primary purpose to benefit employees. 29 C.F.R. § 2550.408b–3(h)(3); 26 C.F.R. § 54.4975-7(b)(8)(3).

21.     Exempt loans warrant "special scrutiny" and must be "truly arranged primarily in the interest of participants and their beneficiaries rather than, for example, in the interest of certain selling shareholders." 29 C.F.R. § 2550.408b-3(b)(2).

22.     Once shares of stock acquired with an exempt loan are allocated to individual participant accounts, the shares are no longer collateral for the exempt loan, and the company has no recourse against those shares. *See* 29 C.F.R. § 2550.408b–3(e); *see also* 26 U.S.C. § 409(c). Shares that have not yet been allocated to participant accounts are called "unallocated" shares.

23.     Assets owned by an ESOP prior to the making of an exempt loan may not be used to repay the exempt loan. *See id.*; Internal Revenue Service, "Examining Employee Stock Ownership Plans (ESOPs)," p. 13 (2003), *available at* www.irs.gov/pub/irs-tege/epche803.pdf ("The purpose of [29 C.F.R. § 2550.408b–3(e)] is that pre-existing plan assets prior to the exempt loan should not be used to service the debt."); *see also Benefits Comm. of Saint-Gobain Corp.*, 313 F.3d at 928–32; IRS Priv. Ltr. Rul. 8044074, 1980 WL 135505 (Aug. 11, 1980).

### *Exempt Loans and Preferred Stock*

24.     Corporations may issue multiple classes of stock with distinct rights and obligations.

25.     "Preferred stock" is a class of stock that typically bestows upon the holder the right to receive specified dividend income from the company that issued the stock. The guaranteed dividends to preferred stockholders have priority over the claims of other stockholders, *i.e.*, "common" stockholders.

26.     "Convertible preferred stock" is preferred stock that may be converted to common stock pursuant to terms defined between the company and the buyer of the convertible preferred stock.

27.     The fixed income provided by preferred stock dividends, combined with the flexibility to convert it to common stock if common shares would produce meaningful gains,

generally allows private companies to price convertible preferred stock at a premium relative to common stock.

28. Issuing and managing convertible preferred stock in the context of a leveraged ESOP funded by an exempt loan creates risk of unfair treatment of ESOP participants, if the ESOP paid a premium price for the convertible preferred stock.

29. While dividends earned on company stock acquired by an ESOP with the proceeds of an exempt loan generally may be used to repay the corresponding exempt loan, using convertible preferred stock dividends for which the ESOP paid a premium price to reduce the employer contributions that the ESOP would be entitled to regardless of whether the shares were convertible preferred shares or common shares negates the extra value associated with preferred stock for which the ESOP paid the premium price. In order for the ESOP and its participants to receive the economic benefit of the premium price paid for convertible preferred stock, the ESOP must receive *both* the employer contributions necessary to repay the exempt loan *and* the preferred dividends. Otherwise, the ESOP overpaid for the stock by paying a higher price for income to which it was already entitled, and the stock acquisition transaction was therefore prohibited. *See* 29 U.S.C. § 1106(a)(1)(A); 29 U.S.C. § 1108(e)(1); *see also Randall on behalf of Wells Fargo & Co. 401(k) Plan v. GreatBanc Tr. Co.*, 2024 WL 713997, at *6 (D. Minn. Feb. 21, 2024).

30. Additionally, if the preferred dividends that generated the premium price for convertible preferred shares are intended to be used to offset the employer contributions to which the ESOP is otherwise entitled, an exempt loan made in the amount of the premium price is not made primarily for the benefit of employees. In such a case, the premium amount of the exempt loan is made to benefit the seller by awarding a premium price without a corresponding economic benefit to employees, and the loan is prohibited. *See* 29 C.F.R. § 2550.408b-3(b)(2). The making

of the loan is also disloyal and imprudent, and such offsetting of employer contributions, if carried out, constitutes the misuse of Plan assets for the benefit of the company and seller. *See* 29 U.S.C. § 1104(a)(1); *Arnold v. Paredes*, 714 F. Supp. 3d 962, 984 (M.D. Tenn. 2024); *Randall*, 2024 WL 713997, at \*7.

### *Defendants' ESOP Recapitalization of 1A Auto, Inc.*

31.     The Plan formation transaction closed on April 29, 2022. Prior to the transaction, the Family Defendants, on a combined basis, owned 99% of 1A Auto, Inc.'s stock. The only stock issued by 1A Auto, Inc. prior to the transaction was common stock.

32.     An impetus for the Plan formation transaction was that Michael Green and Jennifer Gavrichev wished to obtain partial liquidity for their shares. Michael Green and Jennifer Gavrichev would retain part ownership after the transaction, but each wished to cash out part of their stake.

33.     Liquidating part of their respective stakes through an ESOP provided tax benefits to Michael Green and Jennifer Gavrichev so long as together they sold at least 30% of the value of all of the company's stock to the ESOP. *See* 26 U.S.C. § 1042(b)(2).

34.     The Family Defendants consulted with advisors and selected a particular form of leveraged ESOP structure for their transaction. The Family Defendants' chosen structure involved (1) the creation of a new convertible preferred class of stock; (2) the sale of that convertible preferred stock to a newly-formed ESOP at a premium price relative to common shares, funded by a loan from the company to the ESOP; (3) provisions permitting 1A Auto, Inc. to use the new convertible preferred stock's preferred dividends to offset 1A Auto, Inc.'s future contributions to

service the ESOP loan; and (4) provisions for the convertible preferred stock to be converted back to common stock at a 1:1 ratio in the future.

35.     The Family Defendants' chosen structure is rarely used. And in ERISA cases challenging this structure, courts have denied motions to dismiss. *See Arnold*, 714 F. Supp. 3d at 984; *Randall*, 2024 WL 713997, at *7.

36.     A benefit of the chosen structure to the Family Defendants, in theory, was that Michael Green and Jennifer Gavrichev could be paid cash for 30% of the company's stock value while giving up only 25% of the company's shares. The 5% difference—getting 30% for 25%—was worth an extra $5 million to Michael Green and Jennifer Gavrichev in the sale.

37.     On paper, the Family Defendants believed that the new ESOP's right to annual preferred dividends would account for the extra $5 million. The conceit settled upon by the Family Defendants and their advisors was that a convertible preferred share would be worth around 1.27 times more than a common share due to the preferred dividend rights. Accordingly, 25% of total shares, if designated to be convertible preferred shares, would equal 30% of the company's total stock value. Only around 0.785 convertible preferred shares would need to be issued and sold for every common share.

38.     The supposed extra value of the convertible preferred shares was illusory. The Family Defendants' chosen structure contemplated that the preferred dividends would reduce the company's obligation to fund the ESOP loan payments. This meant that that new ESOP would receive no greater income from the company than if the ESOP had bought common shares, and the company would have no greater obligation to provide income to the ESOP than if the ESOP

had bought common shares. Canceling out the other income the ESOP would be entitled to receive in the deal rendered the convertible preferred stock equal in value to common stock.

39.    The Family Defendants also put a time limit on the supposed extra value of convertible preferred shares. The formation transaction provided that after four years the new ESOP could be terminated, or the company sold, and the convertible preferred shares would automatically convert back to common shares at a ratio of 1:1 without any additional amounts owing to the ESOP. The company could also leverage the threat of forced termination of the ESOP to cause the ESOP to voluntarily convert its convertible preferred stock back to common shares at a ratio of 1:1.

40.    Accordingly, a sale of the company after four years would allow the Family Defendants to receive 74% of the equity proceeds of any future sale (their initial 99% stake minus the 25% sold to ESOP) rather than only 69% (99% minus 30%).

41.    The potential 1:1 reconversion of the ESOP's shares was designed to benefit all non-ESOP stockholders, including Richard Green. By valuing each convertible preferred share at 1.27 times more than a common share, the 75% of shares not owned by the new ESOP would be deemed to be worth only 70% of the company's total stock value. But an actual sale would trigger a 1:1 conversion, and then the 75% block would be worth 75% of stock proceeds. Reducing the number of shares sold to the ESOP to account for their supposed greater value had the effect of enlarging the percentage that non-ESOP shareholders would receive of any future sale after a 1:1 reconversion.

42.    The foregoing tax benefits, front-end price benefits, and potential back-end price benefits motivated the Family Defendants to pursue their chosen deal structure. As the company's 99% shareholders who also comprised the company's board, the Family Defendants had the

authority to orchestrate, and did orchestrate, the foregoing deal in all respects. The Family Defendants employed advisors to structure the deal on their desired terms and then, acting as the company's board, directed the company and its officers to enter into and perform the sale agreement and all related agreements, including the company's loan to the Plan.

43. Each Family Defendant individually approved the sale agreement and loan agreements by directing the company and its officers to enter into and perform the agreements, which included all material terms necessary to produce the foregoing benefits for the Family Defendants, including the valuation and sale of convertible preferred stock to the Plan at a 1.27x markup relative to common stock; a loan from the company to the Plan corresponding to the 1.27x price; provisions for reducing company contributions to the Plan needed to service the loan by the amount of preferred dividends; and provisions for a 1:1 reconversion of the Plan's shares upon a future liquidity event.

44. The Family Defendants, acting as the company's board, also hired Brozen to serve as the Plan's trustee, and had authority to remove him as trustee. As Plan trustee, Brozen approved the deal in all respects on behalf of the Plan, including the valuation and sale of convertible preferred stock to the Plan at a 1.27x markup relative to common stock; a loan from the company to the Plan corresponding to the 1.27x price; provisions for reducing company contributions to the Plan needed to service the loan by the amount of preferred dividends; and provisions for a 1:1 reconversion of the Plan's shares upon a future liquidity event.

### *Administration of the Deal and Effect on the Plan and its Participants*

45. The Plan did not receive adequate consideration for the stock that it purchased from Michael Green and Jennifer Gavrichev. For the price of 30% of the value of the company's

stock, the Plan needed to receive more than 25% of the shares.

46. Providing the Plan with only 25% of the shares based on the false conceit that those shares were worth more for their preferred dividends was inadequate because the contribution-offsetting provision rendered the preferred dividends without value. The Plan overpaid by $5 million for the 25% of shares it received from Michael Green and Jennifer Gavrichev. The purpose of this inadequate exchange was to benefit the Family Defendants and the company.

47. The Family Defendants, as the persons with ultimate control of the administration of the Plan through their control of the company's board, and the Committee, as the Plan's governing body appointed by the board, have had a continuous duty since the Plan formation transaction to remedy the inadequate Plan formation transaction.

48. The Family Defendants and Committee have not remedied the inadequate Plan formation transaction. Instead, the Family Defendants and Committee have administered the Plan to allow the company to use the Plan's preferred dividends to reduce the company's contributions to the Plan. In an annual transaction between the Plan and the company, the Family Defendants and Committee cause the company to use the Plan's preferred dividends to reduce the company's contribution obligation to the Plan. The purpose of these exchanges is to benefit the Family Defendants and the company at the expense of the Plan by positioning the Family Defendants to receive a larger share of future stock proceeds without providing any more income to the Plan than the Plan would otherwise be entitled to receive.

49. The Plan's trust agreement with Brozen—and now Ventura—contemplates that the trustee "shall be under no duty to enforce the payment of any contributions and shall not be

12

responsible for the adequacy of the Trust Fund to meet and discharge any obligations to purchase Company Stock, to make benefit payments or to satisfy any other liabilities under the Plan."

50.    While this trust provision places the first order duty on the Family Defendants and the Committee to prevent the company from using the Plan's preferred dividends to reduce its contributions, it does not absolve Brozen and Ventura of any responsibility for their participation in that conduct. Brozen and Ventura have received preferred dividends from the company on behalf of the Plan on an annual basis and paid them back to the company as loan service payments with knowledge that the company (at the direction of the Committee and Family Defendants) used the preferred dividends to improperly reduce the company's contributions to the Plan. Each payment violated Brozen and Ventura's duty to use Plan income solely for the benefit of participants; their duty to remedy and refrain from participating in or enabling unlawful conduct by their co-fiduciaries; and their overarching duty as trustees to decline to follow unlawful instructions.

51.    Brozen and Ventura had custody and control of the preferred dividends and were empowered under the trust agreement to initiate legal action on behalf of the Plan. Brozen and Ventura could have made reasonable efforts to remedy the ongoing violation of the Plan's rights caused by the contribution offsets, including by declining to transfer the preferred dividends back to the company (which would force the company to make up the balance of the contribution amount) or by going to court to seek rescission and reformation of the Plan formation deal to prohibit contribution offsets for preferred dividends. Brozen and Ventura failed to do anything.

13

52.     By completing the unfair sale to the Plan, effectuating the transaction's unlawful design through annual contribution offsets, and failing to seek any remedy, Defendants have deprived Plan participants of shares or other assets in their individual accounts.

53.     Had Defendants not permitted the company to use the Plan's convertible preferred dividends to reduce the company's contribution obligations, the Plan would have received more income. With more income, the Plan would have been able to make additional loan payments each year. Additional loan payments would have resulted in more shares being allocated to each participant's account each year. And because the preferred shares would have been more valuable than common shares had the preferred dividends not been used to offset the company's contributions needed to make the ESOP loan payments, the additional shares allocated to participant accounts would be fairly valued at the higher price that Defendants have used for the Plan's shares. The only difference would be that each participant would have more shares and therefore a higher total account value.

54.     Alternatively, the Plan would have retained the additional income provided by the preferred dividends and invested it. In that case, the Plan would have made the same loan payments, and the same shares would have been allocated to each participant and valued by Defendants in the same way. The difference would be that a portion of each preferred dividend paid to the Plan would have been allocated to each participant's account on top of the shares held in the participant's account. Plan participants additionally would have earned investment income

14

on the dividends. Altogether, between the shares, dividends, and investment income, participants would have greater total account value.

55.     There is no scenario where Defendants' use of preferred dividends to offset Plan contributions did not harm Plan participants.

### *Missing Audit and Issues for Accounting*

56.     Plaintiff's account statements and the Plan's annual reports to the U.S. Department of Labor cannot be reconciled regarding the number of loan payments and share allocations that the Plan has made to date. Plaintiff's account statements reflect that there was a loan payment and share allocation credited for 2021, the "effective" year of the Plan, and then a separate payment and allocation for 2022, the year that the loan was actually made. In contrast, the Plan's annual reports do not reflect that any loan payment or share allocation was credited for 2021.

57.     This discrepancy must be reconciled through a full accounting of the Plan's loan and share allocations made to date. Only then can Plaintiff determine the precise number of shares that should have been allocated to participants, had Defendants properly ensured the Plan received all income to which it was entitled. Defendants' apparent attempt to apply income recognized by the Plan in 2021 to the loan made in 2022 may raise additional issues related to the misuse of the Plan assets impermissible offsets of income owed to the Plan. *See supra* ¶ 23.

58.     The discrepancy is not clarified through supplementary financial statements that benefit plans are required to file with the U.S. Department of Labor. In the Plan's 2022 annual report,[1] the Plan's auditor provided the following statement, noting that it "did not audit or review" the Plan's financial statements for 2021:

---

[1] The Plan was relieved from providing the DOL a copy of audited financial statements in connection with its 2021 annual report because the Plan had not reached the size threshold to mandate filing as of the start of 2021. The Plan was obligated to file audited financial statements

**Other Matter- Report on the 2021 Financial Statements**

We performed a compilation engagement with respect to the 2021 financial statements and our report thereon, dated October 11, 2023 stated we did not audit or review those financial statements and, accordingly, express no opinion or other form of assurance on them.

59.    There are further inconsistences, or errors, in the Plan's reporting with respect to loan payments and share allocations. For example, the Plan's 2022 annual report disagrees with the Plan's 2023 annual report regarding when the loan matures. There are also inconsistencies regarding the amount of loan interest accrued or paid each year, and whether interest payments are being made at all. The amounts reported to be paid on the loan as principal are also not supported by the number of shares reported to have been allocated. These issues also require an accounting to determine whether Defendants have properly managed the Plan's loan and provided participants all of the share allocations to which they are entitled.

## PLAN-WIDE RELIEF

60.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

61.    Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary violations of ERISA and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

---

with its 2022 annual report, and it is customary for the audited financial statements pertaining to a particular year to consider and make reference to the financial statements for the prior year. Without regard to whether the Plan was obligated to provide its 2021 financial statements to the DOL as an attachment to its 2021 annual report, the auditor's statement in the Plan's 2022 report and financial statements implies that the 2021 financial statements were available but not reviewed or audited. The Plan's 2022 report and financial statements were made less reliable by Defendants' failure to ensure that the 2021 financial statements were reviewed and audited in connection with the 2022 audit and report. The 2022 report provides no answer for why Plaintiff's account statements reflect a loan payment and share allocation for 2021.

62.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interests are aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

64.     Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All Plan participants since the inception of the Plan, excluding employees who left the company before vesting in any part, and excluding Defendants, any Committee member, and any other persons with fiduciary responsibilities related to transactions between the Plan and the company or Defendants.

65.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has more than 300 participants with account balances.

66.     Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a 1A Auto, Inc. employee with an account in the Plan, and all Plan participants suffered injuries, as Plaintiff did, resulting from the unlawful use of Plan assets to offset employer contributions owed to the Plan, and from other unlawful dispositions of Plan assets. All Plan participants have an interest in a complete accounting of the Plan since its inception to ensure that participants' accounts are credited properly.

67.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does

not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

68.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.    Whether each Defendant was a fiduciary of the Plan, and the scope of their duties;

    b.    Whether Defendants failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

    c.    Whether the exempt loan and use of preferred dividends to pay employer contributions violated 29 U.S.C. § 1106;

    d.    Whether the Plan received adequate consideration from Michael Green and Jennifer Gavrichev;

    e.    The proper form of equitable and injunctive relief; and

    f.    The proper measure of monetary relief.

69.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

70.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would

substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of the interests of all participants.

71.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

72.    Plaintiff and his undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## CAUSES OF ACTION

## COUNT I

**Breach of Fiduciary Duty, 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1105(a)**
**Against All Defendants**

73.    Plaintiff incorporates the foregoing allegations by reference.

74.    The Family Defendants and Brozen authorized the terms of the Plan's convertible preferred stock acquisition and corresponding loan that allowed the offsetting of employer contributions with preferred dividends, notwithstanding the premium price that the Plan paid for

19

convertible preferred stock relative to common stock. The Family Defendants orchestrated the transaction to benefit themselves at the expense of the Plan, and Brozen had discretion to reject the transaction on behalf of the Plan but did not. Each of the Family Defendants and Brozen acted as a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) with respect to the Plan formation transaction and corresponding loan, and each of these Defendants failed to satisfy the fiduciary standard of care under 29 U.S.C. § 1104(a)(1) by orchestrating or approving the inequitable terms of the deal.

75.    Additionally, the Family Defendants and the Committee allowed the company to use the Plan's preferred dividends to reduce its contributions owed to the Plan. Brozen and Ventura paid the Plan's preferred dividends to the company knowing that those payments enabled the company to offset its contributions owed to the Plan. The Family Defendants, the Committee, Brozen, and Ventura each had the authority to take action to remedy the value disparity that persisted after the Plan formation transaction. This authority was fiduciary in nature pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) and included the authority to compel the company to cease offsetting contributions with the Plan's preferred dividends; retain the preferred dividends in the Plan to force the company to satisfy its full contribution amount; or seek remedies on behalf of the Plan to rescind and reform the Plan formation transaction and corresponding loan on fair terms. No Defendant took any such action, and each Defendant thereby violated their fiduciary standard of care pursuant to 29 U.S.C. § 1104(a)(1).

76.    Each Defendant participated knowingly in and enabled the breaches of fiduciary duty committed by their co-Defendants and failed to remedy such breaches.

77.    The foregoing actions and omissions of Defendants caused losses to the Plan and its participants in the form of paying too much for the convertible preferred stock and the loss of

20

dividend income and contributions, and the corresponding allocations of shares or cash, that would have occurred. Pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), the Plan is entitled to recover from Defendants all losses to the Plan including lost dividend and contribution income, the excess amounts paid for the convertible preferred stock, and the value of improperly diverted assets of the Plan. The Plan is also entitled to disgorgement of profits that Michael Green and Jennifer Gavrichev have realized from these violations of ERISA.

78.    Plan participants are entitled to an order pursuant to the above provisions or 29 U.S.C. § 1132(a)(3) requiring such allocations or adjustments to their accounts as necessary to put them in the position that they would be in had the Plan received all employer contributions that should have been made to service the exempt loan without regard to any reduction for payments on the exempt loan that were funded by convertible preferred stock dividends for which the Plan paid a premium or by pre-existing assets of the Plan. Plan participants are further entitled to rescission and reformation of any governing documents of the Plan or contracts involving the Plan that purport to authorize the unlawful contribution offsetting-conduct described herein.

## <u>COUNT II</u>

**Prohibited Transactions in Violation of 29 U.S.C. § 1106(a) and 29 U.S.C. § 1105(a)
Against All Defendants**

79.    Plaintiff incorporates the foregoing allegations by reference.

80.    1A Auto, Inc. has at all times been a party in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(C).

81.    Each Family Defendant has at all times been a party in the interest to the Plan pursuant to 29 U.S.C. § 1002(14)(E), (H) & (I).

82.    Given the premium price that the Plan paid for 1A Auto, Inc.'s convertible preferred stock—notwithstanding the allowance of offsets against employer contributions for

preferred dividends—and the intention and effect of thereby creating an additional benefit for 1A Auto, Inc. and the Family Defendants, (i) the sale of convertible preferred stock by the 1A Auto, Inc. to the Plan, (ii) the corresponding loan between 1A Auto, Inc. and the Plan, and (iii) use of preferred dividends on an annual basis to offset employer contributions were prohibited transactions in violation of 29 U.S.C. § 1106(a)(1).

83.    The Family Defendants orchestrated the initial sale to the Plan and the corresponding loan, and Brozen had discretion to reject the sale and loan on behalf of the Plan but did not. Each of the Family Defendants and Brozen acted as a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) with respect to causing these transactions and violations of 29 U.S.C. § 1106(a)(1).

84.    The Family Defendants, the Committee, Brozen, and Ventura each had authority to stop the company's use of Plan dividends to offset contributions but failed to act. Each Defendant therefore acted as a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) with respect to causing these transactions and violations of 29 U.S.C. § 1106(a)(1).

85.    Each Defendant participated knowingly and enabled the prohibited transactions committed by their co-Defendants, and failed to remedy such violations.

86.    As a result of the prohibited transactions described in this section, the Plan and its participants suffered the same losses and are entitled to the same relief as described in paragraphs 77 and 78, above.

## COUNT III

**Prohibited Transactions in Violation of 29 U.S.C. § 1106(b)**
**Against Michael Green and Jennifer Gavrichev**

87.    Plaintiff incorporates the foregoing allegations by reference.

88.    Michael Green and Jennifer Gavrichev orchestrated the sale of stock to the Plan

on unfair terms, designing and approving all aspects of the deal with their chosen advisor and chosen trustee for the purpose of providing themselves an extra $5 million in the sale and larger stakes in any future sale. The foregoing actions violated 29 U.S.C. § 1106(b)(1)–(3).

89.    As a result of the prohibited transactions described in this section, the Plan and its participants suffered the same losses and are entitled to the relief as described in paragraphs 77 and 78, above.

## COUNT IV

### Accounting of the Plan Pursuant to 29 U.S.C. § 1132(a)(3)
### Against Ventura and Committee

90.    Plaintiff incorporates the foregoing allegations by reference.

91.    The Plan's annual reports contain inconsistent information with respect contributions, loan payments, and share allocations and cannot be reconciled with Plan participant account statements.

92.    Ventura and the Committee have failed to ensure the Plan's annual reports are consistent and accurate.

93.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff, on behalf of the Plan, is entitled to an accounting of the Plan from the date of its inception through the present in order to determine the correct share allocations that should have been made to Plan participants.

94.    After the above-described accounting, Plaintiff and the Plan are entitled to demand and receive appropriate additional relief based on facts discovered through such accounting.

## PRAYER FOR RELIEF

95.    Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

        A.    Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan

23

pursuant to 29 U.S.C. § 1132(a)(2);

B.   Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as class representative, and certify his counsel as class counsel;

C.   Order Defendants to make good to the Plan all losses resulting from their violations of ERISA, and to disgorge their profits;

D.   Order an accounting of the Plan;

E.   Impose equitable and injunctive relief sufficient to protect Plan participants in the future and ensure proper allocation of cash proceeds and other relief obtained in this action to Plan participants;

F.   Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

G.   Award prejudgment and post-judgment interest; and

H.   Award such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Date: July 28, 2025

**ENGSTROM LEE LLC**

/s/ Mark E. Thomson
Mark E. Thomson, MN Bar No. 0398260*
Carl F. Engstrom, MN Bar No. 0396298*
323 N Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
mthomson@engstromlee.com
cengstrom@engstromlee.com

**BLOCK & LEVITON, LLP**
Jason M. Leviton (BBO #678331)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: 617-398-5600

24

jason@blockleviton.com

*Admitted *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 28, 2025, the foregoing was electronically filed using the CM/ECF system, causing a Notice of Electronic Filing to be transmitted to all counsel of record.

/s/Mark E. Thomson

Mark E. Thomson
